(No. 10701.)

LOUISE C. GREENACRE, Defendant in Error, vs. OTTO F. FILBY et al. Plaintiffs in Error.

*Opinion filed December 21, 1916.*

1. EVIDENCE—*state of mind of a person is a fact to be proved like any other fact.* The state of mind of a person is a fact to be proved like any other fact if it is relevant to the issue; and it is necessarily shown by some external manifestation or some declaration showing the fact.

2. SAME—*what declarations of the deceased are admissible.* In an action for damages under the Dram-shop act for the death of the plaintiff's husband, who was run over about midnight by a fast passenger train while he was lying on the track, declarations by the deceased made about nine o'clock in the evening, when he was on his way home, to the effect that he was going home, kiss his wife and babies and go to sleep, are competent, where the evidence shows that he did go home very soon after making this statement.

3. SAME—*what not admissible as showing intention to commit suicide.* In an action under the Dram-shop act for damages to the means of support of the plaintiff, whose husband was run over and killed by a train about midnight while he was lying on the track, a declaration made by the decedent about two years before the accident, in a conversation with reference to the suicide of another man by drowning, to the effect that when he (the declarant) got ready to go he would throw himself in front of a passing train, is not admissible to show an intention to commit suicide.

4. SAME—*what testimony is not admissible.* In an action under the Dram-shop act, where plaintiff's husband was run over by a fast train due at the place of the accident about midnight, testimony to the effect that one evening several months before the accident the decedent, who with others was watching the headlight of an approaching train, remarked that if a man were on the crossing (which was near the place the accident subsequently occurred) the engineer could not see him until too late to stop the train, is not admissible.

5. SAME—*general rule as to the admissibility of declarations with reference to suicide.* Declarations of a deceased person that he intended to take his own life, when not a part of the *res gestæ* nor accompanied by any act which they might serve to explain and which do not characterize the transaction, are not admissible. (*Siebert* v. *People,* 143 Ill. 571, adhered to.)

6. INSTRUCTIONS—*when an instruction as to damages is not erroneous.* In an action under the Dram-shop act for damages to the plaintiff's means of support through the accidental death of her husband, an instruction which informs the jury that it is proper to consider the probable length of the life of the husband if terminated by natural causes is not erroneous in omitting reference to the consideration of the probable length of the plaintiff's life.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Kane county; the Hon. MAZZINI SLUSSER, Judge, presiding.

B. P. ALSCHULER, R. C. PUTNAM, and J. C. JAMES, for plaintiffs in error.

JOHN M. RAYMOND, and JOHN K. NEWHALL, for defendant in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The defendant in error, Louise C. Greenacre, recovered judgment for $3065 and costs in the circuit court of Kane county against the plaintiffs in error, Otto F. Filby and Adolph J. Wiest, keepers of dram-shops at Hinckley, in DeKalb county, and the Aurora Brewing Company, owner of the premises where the dram-shops were kept, for injuries to her means of support by the death of her husband, Frank Greenacre, alleged to have been caused by his intoxication. The Appellate Court for the Second District affirmed the judgment, and the record has been brought to this court by writ of *certiorari.*

Frank Greenacre, the husband of the plaintiff, was a buyer and shipper of live stock at Hinckley, in DeKalb county. At about 11:52 in the night of November 15, 1913, the "Oriental Limited," a fast passenger train of the Burlington railroad, which did not stop at Hinckley, passed through the village going west, and as the train was going

around a curve east of the depot the engineer saw Green-
acre lying across the track. The engine was a short dis-
tance away, so that it was impossible to stop the train and
Greenacre was run over and killed. The questions of fact
in dispute at the trial were whether Greenacre was so in-
toxicated as to be unable to exercise care and caution for
his own safety, and whether he was on the track in conse-
quence of such intoxication or went upon the track with
the intention of committing suicide. These questions were
determined by the judgment of the Appellate Court unless
prejudicial error was committed by the trial court. It is
not contended that any error was committed in the admis-
sion or exclusion of evidence concerning the intoxication
of Greenacre or his consequent inability to apprehend and
guard against danger, but it is contended that the trial court
erred in refusing to admit evidence of his declarations tend-
ing to show that he had an intention to commit suicide.

The court admitted the testimony of two witnesses for
the defendants as to Greenacre's intention in the evening of
the day he was killed, consisting of a declaration of what
he was going to do at a time when he was going to his
home. One of the witnesses was a jeweler who had a time-
clock in his window, and he testified that a little after nine
o'clock Greenacre stopped in front of his store and com-
pared his watch with the window clock, and said, "Charley,
that is my time; I am right within a minute, so it is no
use to change the watch;" that Greenacre started away and
said, "Charley, you know what I am going to do? I am
going home, kiss my wife and the baby good-night and go
to bed." The other witness testified that Greenacre said,
"My watch is only half a minute out of the way; I will
not have to have it set to-night; I will go home, kiss the
babies good-night and go to sleep." Greenacre then went
home, where he arrived about 9:30, and went into the bed-
room where his wife was, but evidence of what he said or
tried to say at that time was excluded by the court on ob-

jection of the defendants. He left the house shortly after ten o'clock and was not again seen by anyone. A fast express train went west through Hinckley at 10:59 and did not stop there, and the train which killed Greenacre was a later train.

The defendants offered witnesses to testify to declarations of Greenacre at different times during the two years before his death as tending to prove an intention to commit suicide at the time he was killed, for the purpose of showing that he was on the railroad track with a suicidal intention. The witnesses were examined out of the presence of the jury and their testimony was rejected. One of the witnesses, who had worked with Greenacre, testified that about two years before his death, in a conversation about a man whom they both knew who had committed suicide by jumping into the Illinois river at Ottawa, Greenacre said he would never commit suicide by jumping in a river but when he got ready to go he would throw himself in front of a passing train. This testimony had no tendency to show an intention in Greenacre to commit suicide but only indicated his view as to the best method of committing the act, and any person might express such a view without having any intention of killing himself. The curve in the track begins east of the depot, and two witnesses testified to a statement of Greenacre in the summer of 1913, when the three were talking in front of the elevator office as a fast train came through Hinckley at about 8:20 in the evening. They talked about the headlight on the engine and the way it shone on the barn and the elevator office, and Greenacre said that if a man was on the crossing the engineer could not see him until he was right on him and could not stop the train in time to avoid killing him. That would be a natural conclusion of any person from the situation, and the statement had no tendency to show any intention to commit suicide, but only that the curve, with the buildings

and obstructions, made the place dangerous. In any view of the law there was no error in rejecting this testimony.

The witness who testified about Greenacre's opinion of jumping into a river was in the habit of working with him, and further testified that one night about two weeks before Greenacre's death the witness met him at eleven o'clock and was asked to have a drink with him, and Greenacre said it would probably be the last drink they would have together; that the witness asked him if he was going to skip the country, and he replied, "No, I will never leave this town;" that the limited train was passing through, and Greenacre said, "That train is apt to hit me any night;" and that Greenacre also said to the witness at different times when coming to and from the stock yards, that he would like to jump in front of the passenger train. Another witness testified that on Sunday before the deceased was killed, while loading stock at the yards, Greenacre said that was the last load he was going to ship. The defendants also offered to prove by a witness who had been sworn, that in August, 1913, Greenacre offered the witness a drink and said it might be the last he would have with him; that life was getting to be a hard game and he was tired of it and intended to go away and never return; that about noon on the day Greenacre was killed he met the witness and asked him if they were square in money matters; that he said he was tired of the game, and the witness told him not to take things too seriously, to which Greenacre replied that if the witness had his troubles he would be tired of the game, too.

The argument against the ruling of the court is, that the circumstances proved were such that Greenacre might have been on the track either in consequence of his intoxicated condition or with an intention to commit suicide, and that his declarations, made at different times before that, were admissible as proof that he then had an intention to commit suicide. It is true that the state of mind of a person, like the state or condition of the body, is a fact to be

proved like any other fact, whenever it is relevant to the issue to be tried. It is necessarily shown by some external manifestation, either by an appearance of anger, fear, hatred or some other mental emotion, or some declaration showing the fact. If the offered testimony of declarations made by Greenacre at other times, neither connected with or explanatory of any act nor preliminary to or in preparation for any act, was admissible as proof of an intention to commit suicide at the time he was killed, then it was a legitimate means of proof to show what Greenacre said about it. On the question here presented this court, in *Siebert* v. *People*, 143 Ill. 571, upon a full consideration of the question and authorities, adopted the rule that declarations of a deceased person that he had intended to take his own life, when not a part of the *res gestæ* nor accompanied by any act which they might serve to explain and which do not characterize any transaction, are not admissible in evidence. It is argued that the decision in the *Siebert case* as to the admissibility of the evidence was caused or influenced by the fact that the arsenic found in the stomach of the deceased was administered at a time when it was impossible for him to procure or take it himself. That fact was considered by the court on the issue of fact, but, of course, it did not determine the admissibility of evidence, and the legal question whether the evidence was competent was stated by the court and determined upon a full consideration of the authorities and the law. The court adopted the rule of *Commonwealth* v. *Felch,* 132 Mass. 22, although it was said that the decision had been overruled in *Commonwealth* v. *Trefethen,* 157 Mass. 185. The decision in the *Siebert case* was indorsed in *Howard* v. *People,* 185 Ill. 552, where it was held that there was no error in excluding conversations with the deceased as to when, where and by whom the act causing her death was committed. It is true that the questions called for answers tending to prove the fact in controversy, but that is equally true of the evidence offered in

this case. The argument for its admission is, that the declarations were so related to the event that they tended to prove the fact of suicide and were admissible on account of their relevancy to that alleged fact. In *Clark* v. *People,* 224 Ill. 554, it was held that declarations of the deceased, made over a year before her death, of her intention, under certain·circumstances, to commit such an act as was committed which caused her death, were not competent, and the decisions in the *Siebert case* and the *Howard case* were approved. It is again urged that the court there found that it was not probable or possible that the deceased did cause her own death, but that was also upon consideration of the question of guilt or innocence and not concerning a rule of the law of evidence. It was not decided in these cases that declarations of intention are never competent, and it had already been decided in *Riggs* v. *Powell,* 142 Ill. 453, where a widow held a note indorsed by her deceased husband which she claimed as a gift, that it was competent to prove his declarations in reference to providing for his wife, to show that such a gift as was claimed might probably have been made because the gift was consistent with the avowed purpose and feeling of the husband. Afterward, in *Towne* v. *Towne,* 191 Ill. 478, it was deemed competent to prove declarations by the owner of a certificate in a benefit society concerning the beneficiaries, showing that he did not know of the mistake in the certificate. It was said that the declarations were not competent evidence of the fact that the certificate was made out as he said it was, but it was material to know whether he knew of the mistake or acquiesced in it and his declarations on that subject were competent evidence. In *Treat* v. *Merchants' Life Ass'n,* 198 Ill. 431, which was an action on a life policy, it was claimed that the insured committed suicide, and it was held error to refuse to permit the agent who took the application to testify that the insured, immediately after signing it and before the policy was delivered, asked if the company paid losses on

suicide, and on the answer that it did not, made some re-
mark about canceling the application. The statement was
made while engaged in the transaction and was considered
competent to show what was in the mind of the insured at
the time he made the contract by taking out the insurance.
In *Nordgren* v. *People,* 211 Ill. 425, it was charged that the
accused gave his wife a bottle of whisky and strychnine,
and it was held competent to prove that she kept whisky
and strychnine in her room, and, as an explanation of her
act, that she made declarations when despondent tending
to show her intention to commit suicide. The declarations
were not regarded competent as original evidence that she
committed suicide, but as explanatory of the act of keeping
in her room bottles of whisky and strychnine poison. In
*Mutual Life Ins. Co.* v. *Hillmon,* 145 U. S. 285, Sallie E.
Hillmon brought three suits against insurance companies on
policies insuring her husband's life and offered evidence that
he left Wichita, Kansas, on or about March 5, 1879, with
one Brown and traveled south in search of a ranch, and
that on the night of March 18, while in camp at Crooked
creek, he was killed by the accidental discharge of a gun.
The defense was that the body of the person killed was not
that of Hillmon but of one Walters. It was proved that
Walters was at Wichita a day or two before March 5 and
left and was never heard from. Letters written by him,
received at Fort Madison, Iowa, on March 3 and March 4
or 5, stating that he was going to leave Wichita on March 5
with Hillmon, who intended to start a sheep ranch, were
competent evidence as one of a chain of circumstances on
the question whether the body was that of Hillmon or Wal-
ters. Walters left Wichita at the time that it was alleged
Hillmon left, and his letters that he was going with Hill-
mon were competent in connection with his act of leaving,
as having a natural tendency to prove that he went with
Hillmon. The decisions in this State are in harmony and
we are satisfied with the rule established by them. Evi-

dence that when Greenacre was going home he declared his intention to go home, kiss his wife and babies and go to sleep, was competent and was admitted as showing his last declared intention in connection with his act. If in every case where one since deceased considered at any time the question to be or not to be, with an inclination or decision toward the negative, his declarations neither connected with any act nor preliminary to or preparatory for any act could· be proved, it would open a limitless field of inquiry as to the circumstances under which the declarations were made and whether in normal conditions or at times of exceptional misfortune, discouragement and despondency. It would raise all sorts of psychological questions of mental states and intentions at different times and changes of intention from external conditions.

Complaint is made of some rulings of the court, but counsel say they do not regard them as of controlling importance. One is that the court sustained an objection to testimony of what Greenacre's wife said to a witness. The witness was asked when he called a man intoxicated, and he replied that he thought that he had good reason to know when a man was intoxicated, and then started to tell something that Greenacre's wife had said to him. He had not been asked anything on that subject and there is no way of telling from the record what the answer would have been, but the ruling was right anyhow, because the attempted statement was not responsive to any question. The plaintiff was asked what time Greenacre came home the day he was killed, and she answered that he came home about one o'clock and was so much under the influence of liquor that she had to help him to bed, and he stayed there until half-past four. The defendants moved to strike out the answer except as to the time that Greenacre came home, and the court overruled the objection but afterwards struck out the answer. Whether the first ruling was right or not, the answer was struck out. One of the defendants was asked

when he first learned that any claim was made by the plaintiff that her husband was intoxicated on the night of his death, and an objection was sustained. Of course, it made no difference when the witness first learned of the claim. When the court and the attorneys came from the judge's chambers, where they had been arguing the admissibility as evidence of Greenacre's declarations, the defendants asked leave to withdraw a juror, and presented to the court three affidavits that one of the attorneys for the plaintiff, as they came out from the judge's chambers, said, "We've got them on the run." The attorney denied that he made the statement and the motion was overruled. There was no evidence of any juror that he heard the remark or that he gave any heed to it if he did, and the ruling was right. Objection is made to the closing argument to the jury, but there was no impropriety in it.

The second instruction given at the instance of the plaintiff is objected to because it included all damages sustained, without any limitation to the plaintiff's means of support. Taking the evidence and instructions together, the jury could not have understood that any injury could be made the basis of their verdict other than the injury to the means of support.

The fifth instruction is objected to because it told the jury that it was proper to consider the probable length of life of Greenacre until terminated by natural causes and did not also include the probable length of the plaintiff's life. It is the same instruction given in *Betting* v. *Hobbett,* 142 Ill. 72. There was no exclusion of the probable length of life of the plaintiff, and no jury possessed of ordinary intelligence would understand that the injury to her means of support would be continued beyond her natural lifetime.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*