May Danhof, Plaintiff-Appellee, v. Harriet E. Osborne, d/b/a Duffy's Tavern, Defendant-Appellant, Henry A. Buttell d/b/a Hank's Tavern, Co-Defendant-Appellant.

Gen. No. 10,901.

Second District.

June 7, 1956.

Rehearing denied July 16, 1956.

Released for publication July 17, 1956.

531

Bozeman, Moran & Klockau, of Moline, and Frank G. Schubert, of Springfield, for appellant; Bernard J. Moran, and Hubbard B. Neighbour, both of Moline, and Frank G. Schubert, of Springfield, of counsel.

Edward Zukosky, of Wenona, for appellee.

JUSTICE CROW delivered the opinion of the court.

This is a suit under the Dram Shop Act, ch. 43, Ill. Rev. Stats. 1953, par. 135, for loss of means of support by May Danhof, wife of Cornelius P. Danhof, sometimes known as "Pelie" Danhof, against the defendants as owners and proprietors of two taverns in which she alleges her husband was sold or given alcoholic liquor and thereby became intoxicated. The action is for alleged injury in her means of support resulting "in consequence of the intoxication" of her husband. The jury returned a verdict for the plaintiff of $10,000. Judgment was entered thereon. The defendants appeal, after denial by the trial court of their motions for judgment notwithstanding the verdict, and for a new trial. During the course of the trial motions by the defendants for directed verdicts at the close of the plaintiff's evidence and at the close of all the evidence had also been denied. Four instructions were given for the plaintiff; thirty-one instructions were given for the two defendants; and no instructions tendered by the defendants were refused. On this appeal no questions are raised on the pleadings, the admission or exclusion of any evidence, or the instructions.

The amended complaint, in substance, alleged, so far as now material, that the defendants sold or gave alcoholic beverages to Danhof and three other patrons and caused their intoxication; that Danhof and those patrons, as a direct and proximate result thereof, engaged in a fight, scuffle, or drunken brawl with one Harold Morris; and that as a direct and proximate result thereof Danhof suffered certain personal injuries and has now become totally and permanently disabled. The defendants' answers, so far as now material, denied such allegations.

It is the theory of the defendants that (1) their motions for judgment notwithstanding the verdict should have been allowed because, as a matter of

law, the alleged injuries of Danhof and the consequent injury to the plaintiff wife in her means of support were caused by the independent, intervening, wilful, and wanton act of a third party, Harold Morris, the sole cause of the beating Danhof received was an affair he'd had with Vernetta Morris, wife of Harold, the injuries were not in any way related to the alleged intoxication of Danhof, were not a proximate result of any such intoxication, and hence were not in consequence of the intoxication within the meaning of the Dram Shop Act, and because, as a matter of law, the plaintiff wife was an active and willing agent in procuring her husband's injuries, thereby contributing to her own damages, and that she is not an innocent suitor under the Act; and (2) their motions, in the alternative, for a new trial should have been allowed because the verdict is contrary to the manifest weight of the evidence.

Although there are some conflicts in the evidence, which we shall endeavor to note and observe, it substantially appears therefrom that: May Danhof, the plaintiff, 48 years old, is the wife of Cornelius P. Danhof, and on February 24, 1954 (the date of the alleged injury), and prior thereto, Danhof was employed by the City of Lacon, as Chief of Police and maintenance man; his salary was $255 per month, and he contributed something like $200 per month for the support of his wife. Sometime prior to this date and for more than eleven months, he was acquainted with one Harold Morris and Vernetta Morris, his wife, 33 years old, also of Lacon. Mr. and Mrs. Danhof and Mr. and Mrs. Morris had been friends for some years. Danhof, for more than a year prior to the occasion in question, had carried on an affair with Vernetta Morris and had frequently engaged in sexual relations with her. May Danhof, the plaintiff, knew of the affair between her husband and Vernetta Morris and had pro-

tested incessantly to him about it. Two days prior to February 24, 1954, the plaintiff had filed a Notice of Intention to obtain a divorce from Danhof in the Circuit Court of Marshall county; and on February 24th, she had put Danhof's clothes out on the porch of their home and had told him that after that day he'd have to get out. Harold Morris was living with his wife, Vernetta, and three children; he had had some reason to believe an affair was going on between his wife and Danhof; he had warned Danhof on a prior occasion to stay away from her or else something would happen, though he'd never threatened bodily harm to Danhof; and, strangely, Danhof and Morris apparently continued their friendly relations even after Morris' knowledge of Vernetta's and Danhof's conduct. Morris had assisted Danhof in his duties with the City of Lacon, and had borrowed money from Danhof after he had information about the affair. He had previously seen his wife with Danhof at "the tavern," though what tavern he did not say, and he admitted that he was unable to control her. Morris was 5′ 5″ tall, weighed 125 lbs., and was 34 years old; Danhof was 5′ 7″ tall, weighed 195 lbs., and was 51 years old. May Danhof had one artificial leg and the other leg bothered her at times. She had on one prior occasion taken Vernetta out in the country, beat up on her, and tried to explain to Vernetta what she was doing to the Danhof home and children.

On February 24, 1954, May Danhof, while driving in Lacon, saw her husband at Duffy's Tavern, operated by one of the defendants, between 5:30 and 6:00 in the evening, in company with Vernetta and certain other persons. After so seeing her husband, she had dinner, and thereafter drove by the Morris house about 7:00 p. m., talked to Harold Morris, and told him Danhof and Vernetta were going out together. Morris went to "the tavern," evidently Duffy's, to see if Danhof

and Vernetta were still there, and, not finding them, he came home. Later that evening the plaintiff went back to the Morris home; Morris suggested they might be in Chillicothe; it was both his and Mrs. Danhof's idea to go looking for Vernetta and Danhof; Mrs. Danhof had never gone looking for Danhof before; at his request she took Morris and Morris' 4-year-old daughter in her car to Chillicothe,—Morris said he was looking for Vernetta to bring her home,—he was not sure who she was with,—and they drove up to and stopped at Hank's Tavern, operated by the other defendant, at about 8:00 p. m.

As she drove up to the tavern, Danhof, her husband, and Vernetta Morris were in or were just preparing to get into Danhof's car. Morris jumped out of May Danhof's car before it fully stopped, she remaining in the car, and immediately ran toward his wife, saying: "I have caught up with you." He was very angry. Vernetta had stepped out of Danhof's car in the meantime. Before Morris caught up with Vernetta, Danhof got out of his car, tried to stop Morris, but could not, and said to Morris, in substance: "Let's talk it over—I was just going to take her home." Morris answered, in substance—"You have explained to me for the last time you . . . ," cursing him. Then Morris hit Danhof, but did not knock him down. Danhof stood, dazed, started to go, staggered a few steps, or stumbled, or tripped, and finally fell, hit his head on the side of the building, and went down. Vernetta and her sister, Mrs. Niles, say the plaintiff was out of her car and was urging Morris to strike Danhof, but the plaintiff denied that, and said she continued to remain in her car during the altercation. Danhof said the plaintiff made no statement of any kind, so far as he heard, the plaintiff says she said nothing, and Vernetta's and Mrs. Niles' testimony is the only evidence to the effect the plaintiff urged Morris to strike Danhof. Danhof says that he tried to throw up his hands when Morris

started to strike him, but he could not defend himself because he was too intoxicated. After Morris hit Danhof he again went after his wife, dragged her over to May Danhof's car, and tried to put her into it, but she escaped. Morris then hit one Martin, who, meanwhile, had come out of the tavern, with a rock and knocked him down twice. Then he returned to Danhof, who was lying near the corner of the building, and kicked him in the head and cursed him.

May Danhof then, with Morris, drove away in her car. She did not try to determine Danhof's condition at the moment, but drove around the block and on returning in about 5 minutes saw him sitting up, took the keys out of his car, and she then returned to Lacon. She testified on cross-examination "I never saw anyone so mad and so little to do so much as he did. In a space of five minutes, he knocked Floyd Martin down twice, drug his wife by the hair of her head to my car, and hit Pelie twice in the face." She also testified in a deposition as to the conduct of Morris after leaving the scene of the incident with her in her car to return to Lacon,—"He was real excited, and he was still mad, and he said he wished he had beat him up sooner. He wished he had listened to me sooner." She reported the incident to the Mayor of Lacon, Danhof's employer, and later went with the Mayor and his wife to see Danhof that evening at the hospital in Peoria and stayed until early morning. The occasion of February 24th was the first time either Morris or May Danhof had found Danhof and Vernetta together.

Dr. Frank Green examined Danhof between 8:00 and 10:00 p. m. that evening and determined that he should be hospitalized. He was conscious, but unable to talk or move his right arm and leg. His face was badly cut. He was suffering from a cerebral concussion, though he had no fractured skull. He was paralyzed on the right side. His injuries are permanent.

The plaintiff and Morris testified that Danhof was drunk at the time, and so did Danhof, though some other witnesses said he was not intoxicated, the other witnesses who so testified being Vernetta's sister, Mrs. Niles, the man, Floyd Martin, whom she was with, Vernetta (all of whom had been with or around Danhof during the late afternoon and early evening, and all of whom had been doing some drinking themselves), the bartender at one of the defendants' taverns, and another patron at Hank's Tavern. Danhof testified that he drank 20 beers and 5 glasses of whisky at Duffy's Tavern that afternoon and evening between 3 to 4:30 p. m. and 5 to 6 p. m.; Vernetta, her sister, Mrs. Niles, and Floyd Martin were there; others said he had less to drink, but there is no dispute but that he was served some alcoholic liquor; Vernetta had left Duffy's Tavern about 5:30 p. m., had gone home, and had prepared dinner for her husband and children; Danhof evidently left Duffy's Tavern later, picked up Vernetta, who had told her husband she was going out to make some arrangements about attending someone's funeral, and, with her, he arrived at Hank's Tavern at about 7:30 in the evening; Vernetta's sister, Mrs. Niles, a young daughter of Mrs. Niles, and Floyd Martin accompanied Danhof and Vernetta, in another car, to Hank's Tavern; and Danhof said he drank 6 junior beers at Hank's Tavern. Others, however, again said he had less than that to drink at Hank's but, here also, there is no dispute but that he had there been served some alcoholic liquor.

Danhof and Vernetta generally met in "a tavern" during the period they had been running around together. Danhof and Vernetta had been together, with Mrs. Niles and Martin, at Hank's Tavern, at least, on other prior occasions. Floyd Martin, who had been with Mrs. Niles, Vernetta's sister, and in the company of Danhof and Vernetta, in Duffy's and Hank's Tav-

538

erns, was employed as a part time bartender at Duffy's. The fact that Danhof and Vernetta were seeing each other had been mentioned to the proprietor of Duffy's, though she said she did not believe it. Danhof was also known by the proprietor of Hank's Tavern; he had been there before; and the bartender at Hank's knew Danhof, Vernetta, Mrs. Niles, and Martin.

■ The first real issues seem to be whether the injury to the plaintiff in her means of support was "in consequence of the intoxication," i. e., whether Danhof's intoxication was a proximate cause of his being hurt and disabled and the plaintiff being so injured in her means of support: Whiteside v. O'Connors (1911) 162 Ill. App. 108; Hill v. Alexander (1944) 321 Ill. App. 406. Where the action is for an injury allegedly resulting "in consequence of the intoxication" of any person, the intoxication must be a proximate cause of the injury; the defendant need not, however, have foreseen the precise injury which results; also, the intoxication need not be the sole cause, or the last or nearest cause; it is sufficient as a proximate cause if it concurs with some other cause acting at the same time, which in combination with it causes the injury; but the injury must be a natural and probable consequence of the intoxication and be of such a character as an ordinarily prudent person ought to foresee might probably occur as a result of the intoxication: Whiteside v. O'Connors, supra; Economy Auto Ins. Co. v. Brown (1948) 334 Ill. App. 579. It is not the intention of the Dram Shop Act that the liquor alone, of itself, exclusive of other agency, should do the whole injury: Schroder v. Crawford (1880) 94 Ill. 357.

■ The question presented by the defendants' motions for judgment notwithstanding the verdict, therefore, is the rather narrow one of whether there is any competent evidence, together with all reasonable inferences to be drawn therefrom, standing alone, taken

539

with all its intendments most favorably to the plaintiff, tending to prove, and from which the jury might reasonably find, that the plaintiff was injured in her means of support "in consequence of the intoxication" of her husband Danhof, as a proximate result of his intoxication. On such motions we are not concerned with the weight or credibility of the evidence. Reasonable inferences may be drawn by a jury from established facts; a verdict may not be set aside merely because the jury could have drawn different inferences from the evidence; and if there be a competent evidentiary basis for their verdict the jury may disregard or disbelieve alleged facts inconsistent with their conclusion. Only where there is a complete absence of probative facts to support the conclusion drawn by the jury is it reversible error to overrule a motion for judgment notwithstanding the verdict: Lindroth v. Walgreen Co. (1950) 407 Ill. 121; the principles applicable on such a motion are the same as on a motion for a directed verdict, and are well settled: Neering v. Illinois Cent. R. Co. (1943) 383 Ill. 366; Blumb v. Getz (1937) 366 Ill. 273.

■■■■ What is the proximate cause of an injury is ordinarily a question of fact, to be determined by the jury from a consideration of all the evidence and attending circumstances,—it can arise as a question of law only when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from the facts; if it could have been foreseen by the exercise of ordinary care that some injury might or would result from an act, that act is a proximate cause of the injury: Phillabaum v. Lake Erie & W. R. Co. (1924) 315 Ill. 131. An intervening, efficient cause is a new and independent force, the intervention of which was not probable or foreseeable by the first wrongdoer, which breaks the causal connection be-

540

tween the original wrong and the injury and itself becomes the direct and immediate cause of the injury: Phillabaum v. Lake Erie & W. R. Co., supra; Neering v. Illinois Cent. R. Co., supra. An injury, to permit recovery, must be a natural and probable result of the act or omission involved and such as an ordinarily prudent person ought to have foreseen as likely to occur, although it is not essential the defendant should have foreseen the precise injury which resulted, and what is the proximate cause of an injury is ordinarily a question of fact to be determined by the jury: Neering v. Illinois Cent. R. Co., supra (an abnormal criminal act of assault of a third person who had no connection with the defendant railroad was not an intervening, efficient cause, under the circumstances, breaking the chain of causation). The intervention of an independent, concurrent, or intervening force will not break causal connection if the intervention of such force was itself probable or foreseeable, and in such a case the earlier act, if it contributed to the injury, may be regarded as a proximate cause: Neering v. Illinois Cent. R. Co., supra; O'Brien v. Musfeldt (1951) 345 Ill. App. 12.

In Emory v. Addis (1874) 71 Ill. 273, a dramshop case, the Court held a plaintiff wife could recover damages for injury to her means of support where her husband had become intoxicated and nothing was known as to what happened except that he was found the next morning on a railroad track, evidently run over by a train, and the Court observed that, pp. 276, 277: ". . . but for the intoxication he would, in all probability, be living today. . . . No doubt had he been sober he would have gone home with the witness, Bartells, and this fearful calamity would not have happened. . . . *He who deliberately sells that which he knows will inflame the passions, deprive the party of the control of his judgment, and render him, for*

541

*the time being, incapable of exercising proper care for personal safety, or that of his property, must be prepared for the consequences that may follow."* (Emphasis added.)

In Smith et al. v. People (1892) 141 Ill. 447, in a suit on a dramshop keeper's bond for the use of the plaintiff widow the Court held she could recover where the husband had become intoxicated, could not properly and safely manage and drive his team of horses, they ran away, he had been thrown from the wagon, and was killed. The Court said, pp. 452–453:

". . . So, also, if, notwithstanding the intoxication of the deceased, he would not have been killed if his horses had not run away, yet nevertheless there would be a good cause of action. *The very gravamen of the case is, that he, in consequence of his intoxication, was unable to properly manage and control his team, and that in consequence thereof they ran away, and he was thrown out of the wagon and killed. . . .*

"Instruction No. 3 was properly refused, and for like reason. Even if the clips or fastenings on the whiffletrees dropped off and allowed the tongue of the wagon to drop down upon the road, and in consequence the team became frightened and unmanageable, and ran away, *yet, non constat, that if the deceased had been duly sober and in fit condition to manage and control the team he would not have been able to prevent the running away of the horses or the overturning of the wagon."* (Emphasis added.)

In Greenacre v. Filby (1916) 276 Ill. 294, a dramshop suit, the plaintiff widow recovered for injury to her means of support where her husband had become intoxicated and was later found on a railroad track, run over by a train. The Court, in part, said, p. 296:

*"The questions of fact in dispute at the trial were whether Greenacre was so intoxicated as to be unable to exercise care and caution for his own safety, and*

542

whether he was on the track in consequence of such intoxication or went upon the track with the intention of committing suicide." (Emphasis added.)

In Haw v. 1933 Grill, Inc. (1938) 297 Ill. App. 37, an action under the Dram Shop Act, the Court held a plaintiff wife could recover damages for injury to her means of support where her husband became intoxicated at a tavern, noisy, and boisterous, as he had done at that tavern several times before, and a sober third party, one of the tavern agents or managers, struck and injured the husband in attempting to eject him, and it was immaterial whether the third party's act was wilful or accidental, for the intoxication of the husband was a contributing factor and a proximate cause of the injury. The defendant must, under the circumstances, be presumed to have foreseen that its act of selling the liquor might have produced or been followed by the altercation in which the husband was injured, it not being necessary that the defendant should have foreseen the actual result, it being sufficient that such a result might reasonably occur, and the injury was not the result of a so-called independent, intervening cause, namely, an assault by a sober third person, because the defendant might reasonably have anticipated such a consequence as this injury as a result of the intoxication.

In Cross v. Ryan, 124 F.2d 883 (CCA 7th, 1941), the Court held a plaintiff widow and her children could recover under the Dram Shop Act where the husband, Cross, had become intoxicated, had assaulted one Stout, Stout had then assaulted Cross, and Cross, because of his intoxication, was unable to defend himself and was injured. The act of Stout, the assailant, was not an intervening, independent cause; the causal chain was not broken merely because the actual injury was inflicted by Stout, a person not intoxicated, assuming Stout was not intoxicated. The Court said, pp. 886-7:

543

"As to the cause of action set up in counts 1, 4, 7, and 10: In these counts it is charged that the defendant sold intoxicating liquor to George Cross, the husband and father of the plaintiffs, as a result of which he became intoxicated, assaulted and abused George Stout, who in turn by reason of the drunken assault of Cross, *assaulted Cross, who, because of his intoxication, was unable to defend himself, and was thereby injured, from which injuries he died. The defendant-appellant argues* that because it was not alleged that Stout was intoxicated by liquor sold him by the defendant and as a result thereof he assaulted and beat Cross to death, *that Stout was the intervening responsible cause of the injury to Cross, and not the sale of intoxicating liquor to Cross by the defendant.*

"*We think each of the counts states a cause of action.* The statute clearly provides that if the wife and children shall be injured in their means of support in consequence of the intoxication of any person, they shall have a right of action against any person who sold or gave the intoxicating liquor which caused the intoxication of such person, in whole or in part.

"*The allegations of these counts as we have above outlined them come clearly within the provisions of the statute, and allege the causal connection between the sale of the liquor and the intoxication, and the injury and the death. Haw v. 1933 Grill, Inc., 297 Ill. App. 37, 17 N.E.2d 70.*" (Emphasis added.)

In Arington v. Phelps, 79 F. Supp. 295 (D. C. E. D. Ill. 1948), the Court followed Cross v. Ryan, supra, referred to Schroder v. Crawford, supra, Haw v. 1933 Grill, Inc., supra, said that the prevailing judicial authority seems to be that the Dram Shop Act is remedial and should be so construed as to suppress the mischief involved and advance the remedy provided by the statute, and that the Illinois Courts do not follow in dram-shop suits the strict rules of proximate cause abiding in ordinary negligence actions.

544

In Casey v. Burns (1955) 7 Ill.App.2d 316 we recently had occasion to examine some of the foregoing cases. That also was a dramshop suit involving an altercation or assault. We held the plaintiff wife could recover and there was no error in denying the defendant's motions for directed verdicts and for judgment notwithstanding the verdict. The husband had become intoxicated at the defendant's tavern, was found later that evening at the rear of the tavern, beat up, and there was evidence the defendant's bartender had struck the husband with a blackjack. We held there was competent evidence the plaintiff had been injured in her means of support in consequence of the intoxication of her husband, as a proximate result of such intoxication, and that the question of proximate cause was properly a question of fact to be determined by the jury from a consideration of all the evidence and attending circumstances, and was not a pure question of law.

■■■ We think there was competent evidence, together with all reasonable inferences to be drawn therefrom, standing alone, taken with all its intendments most favorably to the plaintiff, tending to prove, and from which the jury might reasonably find, that the plaintiff was injured in her means of support "in consequence of the intoxication" of her husband Danhof, as a proximate result of his intoxication. The injury here incurred is not an unnatural or improbable consequence of the intoxication and is of such a character as an ordinarily prudent person in the position of the defendant tavern operators ought to have foreseen might probably occur as a result, in whole or in part, of the intoxication. Proximate cause here is not a pure question of law only. Some of the facts are disputed, and so far as they are undisputed there can be a difference in the judgment of reasonable men as to the inferences to be drawn therefrom. Proximate cause here is, as it ordinarily is, a question of fact to be de-

termined by the jury from a consideration of all the evidence and attending circumstances. The inference and result reached by the jury is not unreasonable. That the jury might have drawn different inferences and reached a different result is no justification for setting the verdict aside.

■ The Dram Shop Act is remedial in character and should be so construed as to suppress the mischief involved and advance the remedy provided by the statute. That the defendants may not have foreseen the precise injury which here resulted is not significant. It is not the intention of the statute that the liquor alone, of itself, exclusive of some other agency, should do the whole injury. The intoxication of Danhof may not have been, and probably was not, the sole cause of the injury. It may not have been the last or nearest cause. But it certainly at least concurred with another, or other cause,—the Danhof-Vernetta affair and its ramifications and the Morris assault,—acting at the same time, and in combination therewith caused the injury.

The defendants having sold that which they knew would inflame the passions of Danhof, deprive him of the control of his judgment, and render him, for the time being, incapable of exercising proper care for his personal safety, must be prepared for the consequences that may follow. Danhof, in consequence of his intoxication, was evidently unable properly to manage, control, and defend himself,—he said so himself,—and, in at least partial consequence thereof, he suffered his injuries and the plaintiff suffered her injury. Had he been sober he might not have been with Vernetta at all, or he might not have been at the place where and at the time when the incident occurred. Or, had he been sober and in fit condition to manage, control, and defend himself he might have been able fully or better to defend himself and to prevent or greatly minimize

546

the assault of Morris, keeping in mind particularly that Danhof weighed considerably more than Morris and was somewhat taller, though older.

The jury may well have inferred and found that Danhof was so intoxicated as to be unable to exercise due care and caution for his own safety. Danhof's getting out of his car, in the first instance, as Morris came up to Hank's Tavern, trying unsuccessfully to stop Morris, and trying to talk with Morris and make some feeble excuse for having Vernetta with him, may, under the circumstances, considering the unenviable position Danhof was in, have well been a failure to exercise due care and caution for his own safety,—acts which perhaps he or any prudent person in a state of sobriety, rather than inebriety, might not have done, and if he'd stayed in the car, kept quiet, and not perhaps have irritated Morris any further, it is at least possible none of the subsequent injuries he suffered would have occurred.

Further, Morris' blows to Danhof's face did not knock him down; he remained standing, dazed (doubtless partly because of the blows and partly because of his intoxication), started to go, staggered, stumbled, or tripped, and finally fell, hitting his head on the side of the building. To what exact extent that staggering, stumbling, tripping, falling, and hitting his head on the building were due to intoxication, and to what extent those acts were due to Morris' original blows is, of course, impossible to say, and it is unnecessary to know, but certainly to some reasonable extent, and perhaps a substantial extent, those acts were due to Danhof's intoxication and the jury may well have so felt. That some of those actions were, undoubtedly, due to Morris' blows is not significant when the intoxication of Danhof was a concurrent, combined, proximate cause.

547

Danhof and Vernetta were both known at both of the defendants' taverns. They were not just complete strangers coming in for a few drinks. The evidence, together with such reasonable inferences and implications as might have been drawn by the jury therefrom, is sufficient to indicate that they were known by the defendants or their agents to be seeing each other and running around together, though not married to each other, and though married each to someone else. There was at least sufficient known to the defendants to put them on notice of a very delicate, if not a potentially dangerous and explosive, situation, concerning the domestic-marital affairs of the Danhof and Morris families, which a reasonable degree of prudence would seem to indicate ought not to be irritated, enhanced, inflamed, or encouraged. Under those circumstances, particularly, prudence would seem to indicate the defendants should have been more than usually careful and discreet in the dispensing of intoxicating liquor to Danhof.

Under the circumstances here it cannot be said that, as a matter of law, the sole cause of Danhof's personal injuries and the plaintiff's injury in her means of support was the Danhof-Vernetta affair and that the injuries were in no way related to Danhof's intoxication. That affair undoubtedly played its part, an important part, in the drama later developed at Hank's Tavern. But intoxicating liquor consumed by Danhof also played its part, also important. They were doubtless both causes of the resultant injuries, and not mutually exclusive causes. To be a proximate cause, and for it to be possible for the jury to so find, the intoxication need not be the sole cause, or even the last or nearest cause. As long as the intoxication of Danhof concurred with the Danhof-Vernetta affair, acting at the same time, and in combination therewith caused the injuries, it is a proximate cause.

548

Nor, as a matter of law, was the sole cause of Danhof's personal injuries and the plaintiff's injury in her means of support the assault of Morris upon Danhof. The fact that Morris, a sober third party, did strike Danhof, the intoxicated person, does not exempt the defendants, and such does not constitute an independent, intervening efficient cause eliminating the intoxication of Danhof as a proximate cause. That assault did not break all causal connection between Danhof's intoxication and the injuries. That force was itself probable or foreseeable under the circumstances. The assault, with its background in the Danhof-Vernetta affair, combined with Danhof's intoxication and, in concurrence therewith, caused the injuries. Danhof's intoxication continued in part, greater or lesser, to contribute to the injuries and to be a contributing factor and a possible proximate cause, though not necessarily the only cause. The principal cases the defendants refer to on this are Shugart v. Egan (1876) 83 Ill. 56, and Schmidt v. Mitchell (1876) 84 Ill. 195. We do not believe them to be inconsistent with our views, when considered in the light of their particular facts, and also when the other and later cases referred to above are considered. They were each decided but a short while after the adoption of the original Dram Shop Act of 1874. Neither case cites any dramshop case precedents directly in point. The opinion in Shugart v. Egan was the second opinion in the case, after a rehearing had been allowed, and reached the opposite conclusion from the first opinion,—indicating the Court was not altogether sure as to the construction of the then new Act. Schmidt v. Mitchell, though decided at the same term, does not refer to Shugart v. Egan, and in the Schmidt case, after the intoxicated person had received a gunshot wound in the leg, he, against medical advice, and while sober, had walked upon his leg, it became worse, was later amputated

(perhaps unnecessarily), and three hours after the amputation the person died, some several days after the original wound. The Court observed in Arington v. Phelps, supra, for example, as to the Shugart v. Egan case, that though it has not been expressly overruled it has lost its compelling force as authority because of the later decisions,—most of which we've set out above.

In their reply brief the defendants for the first time state a wholly new point, not stated in their original brief, to the effect that Danhof's intoxication, if any, was only a condition which made an injury possible, which condition was not concurrent with the subsequent assault of Morris, and the mere existence of the condition was not a proximate cause of the injury, and they cite nine altogether new cases, not cited (with one exception) in their original brief. Under the circumstances the plaintiff has had no opportunity to respond to that point or those cases, and we do not have the benefit of the plaintiff's views. None of the cases there cited apparently are dramshop cases, except one, Whiteside v. O'Connors (1911) 162 Ill. App. 108, and in that case a judgment for the defendants was reversed and remanded. We do not believe the point or the cases applicable to this dramshop case, except Whiteside v. O'Connors, and it is not favorable to the defendants.

 The second real issue seems to be whether, as a matter of law, the plaintiff wife was an active and willing agent in procuring Danhof's injuries, thereby contributing to her own damages, and whether she is an innocent suitor under the Dram Shop Act. It is, of course, true, as the defendants point out, that if a plaintiff wife could have deprived the husband of the liquor by breaking the jug, or throwing out its contents, and does not do so, she is a willing party to his conduct and cannot recover: Reget v. Bell (1875) 77

550

Ill. 593; or if the injured person is an active and persistent agent, with the tavernkeeper, or alone, in causing the intoxication of his later assailant or the person who injures him, he cannot recover: Hays v. Waite (1890) 36 Ill. App. 397, and Pearson v. Renfro (1943) 320 Ill. App. 202; nor can one recover who is not innocent, i. e., one who is in a party the members of which have been drinking, who has been drinking herself, and is a participant in the intoxication of a person who later injures her: James v. Wicker (1941) 309 Ill. App. 397; nor can the plaintiff who has herself bought the liquor and become intoxicated recover for her own injuries: Buntin v. Hutton (1917) 206 Ill. App. 194. But in the present case the plaintiff May Danhof did not purchase or procure any of the intoxicating liquor at Duffy's or Hank's for Danhof, or participate therein, or have anything whatever to do with such. There is no evidence she urged Morris to strike Danhof except Vernetta's and Mrs. Niles' testimony, which the plaintiff and Danhof both denied, and it was for the jury to decide whom to believe. True, she told Morris that Danhof and Vernetta were going out together, she drove Morris and his daughter to Hank's Tavern, she did not try to determine Danhof's condition immediately after the altercation, and she drove Morris and his daughter back to Lacon. But there is no evidence of any predetermined plan or conspiracy or even conversation between her and Morris that he should assault Danhof; it was Morris' suggestion that they might be in Chillicothe, and it was at Morris' request that she drove to Hank's Tavern; they were evidently simply looking for Danhof and Vernetta, something she'd never done before; and Morris had said he was looking for Vernetta to bring her home; she remained in the car during the altercation, saying nothing (unless Vernetta's and Mrs. Niles' testimony to the contrary was to be believed); within a few minutes

551

after the altercation she returned to the scene and saw Danhof sitting up; she reported the incident to Danhof's employer; and she went to the hospital that night and stayed until early morning. We cannot say, as a matter of law, that the plaintiff was an active and willing agent in procuring Danhof's injuries or is not an innocent suitor. There was no burden of proof on her in those respects: Darby v. Donahue (1954) 3 Ill.App. 2d 112. It was a question for the jury to decide: Lester v. Bugni (1942) 316 Ill. App. 19.

Accordingly, there was no error in denying the defendants' motions for judgment notwithstanding the verdict. The trial court, having the additional benefit of an opportunity to observe the conduct and demeanor of the witnesses, had these same questions before it on these motions and on the prior motions for directed verdicts, and concluded the same should be denied and that it was a proper jury case. We concur.

■ ■ The foregoing will be sufficient, in substance, to indicate our belief that there was also no error in denying the defendants' motions for a new trial. The determination of the weight and sufficiency of the evidence is a fact function for the jury. They must determine the credibility of the witnesses and whom to believe where there is a disputed fact question, and there were some here. They may and must make reasonable inferences and conclusions from the evidence. It is not our function to sit as a trier of the facts, to weigh the evidence as an original matter, or as a matter of initial or first impression, and make a determination ab origine. Only in those instances where we believe a verdict to be contrary to the manifest weight of the evidence may we reverse on this ground. The matter of whether Danhof was intoxicated or not was primarily and typically a jury question of fact, there being evidence to that effect: Watkins v. Gaertner (1952) 348 Ill. App. 125. The jury in the

552

first instance, and the trial judge in passing on this motion, having an opportunity to observe the witnesses, their conduct and demeanor, and determine the weight of the evidence therefrom as well as from the spoken words themselves, felt the preponderance of the evidence here lay with the plaintiff. We cannot say their determination is contrary to the manifest weight of the evidence. The jury was amply instructed. The defendants' theories of the case were ably presented, and they have had a fair trial.

Accordingly, the judgment will be affirmed.

Affirmed.

DOVE, P. J. and EOVALDI, J., concur.