Bill SHAWN, Appellant,

v.

Gary ENGLAND and Larry May, Appellees.

No. 49065.

Court of Appeals of Oklahoma, Division No. 2.

July 5, 1977.

Rehearing Denied July 28, 1977.

Certiorari Denied Sept. 21, 1977.

Released for Publication by Order of Court of Appeal Sept. 22, 1977.

Roland Tague, Kerr, Davis, Irvine, Burbage, Krasnow & Rhodes, Oklahoma City, for appellant.

Kenneth R. Webster, McKinney, Stringer & Webster, Oklahoma City, for appellees.

BRIGHTMIRE, Presiding Judge.

In this declaratory judgment action plaintiff seeks judicial establishment of the fact that a partnership relationship existed between him and the defendants with reference to the publication and sale to the public of a booklet entitled "Oklahoma Weather." A jury found there was a partnership, but the trial court notwithstanding concluded there was none and granted defendants a judgment. It is this decision plaintiff seeks to have nullified.

I

Orientational facts for this controversy began in the summer of 1973. At that time defendant Gary England was a weathercaster for television KWTV Channel 9, Oklahoma City and plaintiff, Bill Shawn—a stock broker with E. F. Hutton and Company—was a stock market reporter and commentator for the same station.

For some time England had made occasional reference to what he called a "thunder lizard" while telecasting the weather. Usually he did so during thunderstorms as an interest provoker particularly during his early morning reports. The make-believe creature engaged Shawn's imagination and eventually it occurred to him that it might be profitable to design and promote the sale of a stuffed thunder lizard which the kids could hold during thunderstorms as a sleep inducing comforter.

One day Shawn broached the idea to his friend England, who immediately thought he saw merit in it. After some discussion the parties decided they needed a commercial artist to help design the mythical animal. To Shawn's mind came a long-time friend and artist, Larry May, with whom he had attended grade, junior high and high school. Shawn contacted May, told him of the contemplation, and upon inquiry learned that the commercial artist was not only interested but willing to help "poor boy" the project by contributing the art work. Shawn told him that he and England had agreed on a 50–50 split of any profit realized and that if May would bring his talents to the endeavor, he, Shawn, would divide his 50 percent with him.

The three individuals staged their initial meeting at May's office and at that time discussed ways to achieve maximum publicity for the fictional lizard. They accepted England's proposal that the three consider themselves equal partners in their venture and divide any profits realized three ways. During the next several months the threesome met nearly every week for a so-called "brainstorming session." At one early meeting they decided to have a drawing contest wherein they would ask the youngsters and adults alike to send in drawings of what they envisioned the thunder lizard to be with the promise of a prize to the winner. The contest met with a good response and May, as judge, picked a nine-year-old boy's drawing for the prize. A little later while continuing pursuit of still better promotional ideas the trio hit upon the idea of a weather fact cartoon book featuring thunder lizard drawings, which after further thought was transformed into a coloring book for the kiddies.

Gary England began garnering material for the coloring book and after accumulating considerable weather data the three men concluded that the publication of a regular weather booklet about the weather in Oklahoma would have even more profit potential than a coloring book in that it would have broader appeal. And so they turned their joint efforts to the development of a weather book.

By January of 1974 England had not only gathered considerable data for the booklet but had written the manuscript. Shawn was given the responsibility of having it typed and edited and he accomplished the assignment with dispatch. England made additional changes in the text and added pictures here and there in an effort to finalize it for publication.

In the meantime, England met with the management of KWTV and discussed the possibility of it underwriting and helping promote the booklet. England reported back that the station agreed to "bankroll" the project by buying enough copies to pay

for the initial production of the work—estimated to be about 13,000 copies—and proceeds from sales exceeding this were to be the profit of the three man partnership.

Then it happened. In April of 1974, at one of their regular Saturday morning meetings, Shawn was abruptly informed he was no longer needed and the partnership was ended. The way it took place, explained Shawn, was that: "Larry and Gary and I—Larry was across the desk [and] started hinting around talking around the subject that we didn't need so many people in the partnership and keep in mind at this particular period of time the transcript was done, it was on the mag cards, it could be changed very simply.

"We had at least a rough agreement with Channel 9 that they were going to produce the book, Larry told me that we didn't need your services anymore and of course, part of what I would have done would have been working in the marketing of the book after the initial distribution over the TV. He said we don't need you anymore."

"But," protested the dismayed plaintiff, "I [have] come this far with you, you know, we've got a partnership. Here we are, we are three months from making a profit on the thing and we can see the end of the tunnel so to speak and you are going to let me out half way . . . ." Shawn turned to England and said, "Is this the way you feel about it?"

"Yes," said England coolly.

Shawn, who said he "was just flat dumbfounded," recovered sufficiently to suggest that "we go ahead, that we split the profit on the initial market area, Channel 9 market area three ways like we had originally agreed to, planned to, and I said for that you can take me once we have done that, you can take the book and you can go to Texas with it, you can go to Minnesota with it, you can do what you want to with it at that time, but I have come too far in this thing to just be caught out in the cold."

"That is fair enough. We agree to that," said the other two partners according to Shawn: And at that point Shawn left.

## II

The two defendants, called to the stand by plaintiff, substantially confirmed plaintiff's testimony. They emphasized, however, that the only partnership the parties entered into was the one created in the summer of 1973 wherein the parties agreed to divide the profits one-third each, and that arrangement related only to the thunder lizard doll proposal. The theory of defendants was that since there never was any further discussion of a partnership or contract thereafter, it could not be said that the original partnership arrangement continued after the abandonment of the stuffed animal concept, even though defendants conceded that the three men continued to meet almost weekly and kick around ideas about how to come up with some means of making money. England admitted, also, that distribution of the book was accomplished as had been contemplated before Shawn's termination. England testified that Shawn's association with the group was terminated because it became clear to him and May that Shawn had nothing to contribute to the partnership. He also added that he was somewhat irked because he had asked Shawn a few days before that time to check on the amount of postage that would have to be paid on the books and that Shawn's failure to respond promptly enough meant that May had to do the work.

. Except for insignificant details May agreed with England's version of what happened at the terminal conference. Both England and May denied that a novational settlement agreement was made, or even discussed, at their final meeting with Shawn.

The first booklet was not sold until the spring of 1975, said England, because the television station decided it would have more of an impact if released in the springtime storm season. In the meantime the 112-page slick paperback was finalized, polished, and published. Entitled "Oklahoma Weather," the monograph's cover featured a color photograph of a dark tornado silhou-

etted against a beautiful golden sunset. Inside the front cover was a recitation crediting "Gary England, chief meteorologist for KWTV Channel 9, Oklahoma City, Oklahoma" with having written and edited the booklet and that the opus was copyrighted and published in 1975 by England and May. Between its covers the booklet featured information about weather in general, about Oklahoma weather in particular, and about the climate of various parts of Oklahoma. It also contained information of a meterological nature, an explanation of various technical aspects of meteorology, and a goodly number of exemplary colored photographs.

At one time (before Shawn's termination) the parties had discussed the possibility of adapting the booklet to various other localities by modifying its format. There might, for instance, be one about Texas weather for Texas, one for Minnesota entitled Minnesota Weather, etc. Envisioned also was a nationwide, or perhaps a worldwide, distribution of this type of a publication. All this, of course, depended on how popular it became locally. And such marketing was to be the responsibility of Shawn.

The booklet was printed and published, as we mentioned earlier, in the spring of 1975 with Channel 9 footing the bill. Apparently the station bought enough of the original copies, perhaps 13,000 to 20,000—a sufficient number to pay the initial printing cost. The total number of booklets sold is not disclosed,[1] but after the booklet was put on the market Shawn called England and made a demand for his share of the profits. England rejected it with the explanation that he, Shawn, had been ejected from the venture and therefore had no interest in it. Shawn then turned to the courts for relief.

### III

At trial both parties requested the court to give special issue questions or special interrogatories to the jury and the court did.

The first question was, "Was there an oral partnership agreement between the plaintiff and defendants whereby each would be entitled to one-third of all net profits from the promotion, production and sale of a book known as 'Oklahoma Weather'?" A unanimous jury answered this, "Yes."

The second question asked was whether "at the time of the termination, abandonment or dissolution, was there an additional contract between the parties?" The jury again answered this, "Yes."

And the third question was this: "Under any additional agreement, what was the percentage of net profits after expenses to be received by the plaintiff?" The jury answered, "One-third."

Based upon these findings judgment was entered directing defendants to account to the plaintiff for one-third of the profits realized from the sale of "Oklahoma Weather." Defendants then moved for a judgment notwithstanding the verdict and on October 24, 1975 the court granted it.

### IV

The single proposition advanced by the plaintiff is, of course, that the court erred in sustaining defendants' motion for judgment notwithstanding the verdict. Whether this contention has merit depends upon whether there is any evidence in the record supportive of the jury's three factual findings. Defendants argue under two propositions saying first of all that plaintiff did not present evidence that a partnership existed among the three parties for the marketing of a weather book; and, secondly, even if such a partnership did exist the plaintiff was not entitled to any profits earned by the entity after its dissolution.

In arguing their first point defendants acknowledge that "all parties to this controversy concede that a partnership existed for the specific purpose of marketing a 'thunder lizard' doll" but this partnership, they

---

1. Though not material to the instant controversy, one deposition does contain information to the effect that at the time it was taken the deponent estimated sales to have been in the neighborhood of 35,000.

insist, was terminated with the "abandonment of that plan." The crux of their argument is that profit sharing was restricted to the thunder lizard doll and perished with the toy and since there was no new agreement made with regard to later projects, namely, the thunder lizard color book or the weather book, Shawn failed to prove any factual foundation for recovery. It makes no difference legally, goes defendants' argument, that Shawn thought the initial partnership continued because the fact of the matter is that it could not have continued since it was never discussed after the first meeting. Defendants' conclusion is, therefore, that the only way plaintiff could have succeeded in this lawsuit was to have presented proof that the disputants specifically articulated an express agreement to participate as partners in the marketing of the weather book—an event which never occurred. In further argument defendants say that the only evidence of an extension of the original partnership agreement to include the weather book was plaintiff's conclusionary testimony that it did exist as a logical extension of the original partnership agreement. This testimony, however, defendants dismiss as an impermissible inference under the holding in *Downs v. Longfellow Corp.*, Okl., 351 P.2d 999 (1960) and therefore insufficient to support recovery.

Defendants' argument, in our opinion, is a non sequitur. First of all, *Downs* is without relevance to the case at bar because it deals with the validity of an expert opinion based upon unproved hypothetical facts. There the court reversed a judgment for the plaintiff awarding him damages for a fire loss because the only evidence of causation was a conclusion of a fire marshal. The fire marshal's testimony was held to be without probative value in that there were no facts in evidence supportive of his inferences. Here, we are not dealing with expert testimony nor with a witness who was asked to express an opinion based upon hypothetical facts.

■ Here plaintiff's attacked testimony consists not of inferential opining regarding hypothetical facts, but concerns the fact of what he concluded at the time he was meeting with defendants—a conclusion which was based on his personal knowledge of what was going on. The issue here is Shawn's status—not the proximate cause of an occurrence. Shawn's state of mind, his "feeling," was in fact a fact—and a material one—which like any other could be proved and considered in connection with all the other surrounding circumstances in resolving the issue. *Greenacre v. Filby*, 276 Ill. 294, 114 N.E. 536 (1916). He himself could testify directly about it. *Wood v. Custer*, 86 Kan. 387, 121 P. 355 (1912). This is not to say that what he thought could not have been wrong, of course, but it is to say that what he thought his status was during the nine month association was a fact having an explanatory bearing on why he continued to devote time and effort to the undertaking for nine months. The distinction between plaintiff's testimony and an inferential opinion, we think, is obvious.

■ In our opinion plaintiff was justified in thinking the partnership status established in the summer of 1973 continued until the day defendants terminated it. The fact that the particular creation at the partnership's inception was abandoned did not prevent it from serving as the metamorphic progenitor of the genre's ultimate yield—namely, the weather booklet. It was a weather related idea that brought the parties together; it was a weather related idea that became the focal point of their first discussions; and it was the same weather related theme which one finds threading through all nine months of weekly meetings.

If in advance of this lawsuit defendants considered the partnership ended with the abandoned lizard plaything they took care to conceal it. Not only did they fail to disclose their thoughts about this but conducted themselves in a manner that demonstrated the very opposite. They continued to welcome plaintiff to their meetings and accept the benefit of his knowledge, experience and thinking. They assigned him a task to perform with reference to the

weather booklet as though he was still partner in the enterprise. And when at last it began to look like success of the venture was near at hand two members of the triumphant trinity decide to tell the third, "We don't need you anymore!" This act, we think, is comparable to that of a pilot at the end of a transoceanic flight who, as soon as he sees the runway and commences his final approach, ejects his navigator from the aircraft with the declaration, "I don't need you anymore!"

Moreover there is another circumstance which we think undermines defendants' position and that is that each admitted he considered himself a partner with regard to the weather booklet venture both before the ouster of Shawn and afterwards, notwithstanding the absence of further definitive discussion of their status after the initial partnership agreement was made. Certainly if between themselves defendants had reason to believe the original partnership status continued throughout the course of their meetings then why would not plaintiff be entitled to entertain the same belief? Neither defendant testified to any circumstance or fact that would have led the plaintiff to believe that the original arrangement did not obtain as to all results of the "brainstorming" sessions particularly with reference to figuring out weather related projects to promote for profit production purposes. No evidence does the record contain justifying defendants' conclusion that the thunder lizard doll project was an isolated endeavor disconnected from what went on afterwards. On the contrary, a fair evaluation of the evidence leads comfortably to the conclusion that the weather booklet was a natural end product of a creative ideological evolution that began with the thunder lizard.

■ Under the facts, it seems to us, and certainly it must have seemed to twelve jurors, as though defendants used the efforts and the mental ability of the plaintiff for as long as they thought they needed him and then, when they got their book about ready to publish and thought they had marketing arrangements made, arbitrarily decided to eliminate his interest in joint venture assets by terminating it. This they could not do. If a partner decides to dissolve a partnership and appropriate the business to himself, he must first fully compensate his copartner for his share of the gain to be realized from the fulfillment of a prospective business undertaking the consummation of which is imminent. *Page v. Page*, 55 Cal.2d 192, 10 Cal.Rptr. 643, 359 P.2d 41 (1961).

### V

■ Defendants' alternate contention is that even if there was a partnership "plaintiff was not entitled to any profits earned by [it] after it was dissolved." In supporting argument defendants say the law is that a terminated partner has a right to share in profits earned by the post dissolution partnership's continuation if such partner has an interest in the capital used to produce the profit, unless such interest is "negligible," and in the instant case plaintiff's interest is negligible because "he made virtually no contribution to the final product."

While the law is correct its application to the facts is not. Evidence narrated earlier, destroys the contention. Not only did Shawn initiate the venture but he brought the parties together in furtherance of it. For nine months he attended meetings and presumably contributed his fair share of input into the trinity's joint search for the most profitable product—at least there is no evidence to the contrary. And this, together with the fact he carried out the one task assigned to him—getting the manuscript typed and edited—constitutes more than a negligible contribution to the partnership's main asset, the weather booklet.

The jury found the fact to be that plaintiff had entered into an agreement with defendants on April 13, 1974 settling the controversy in a way that determined the extent of plaintiff's interest in the booklet and the means of compensating him for it, viz., that plaintiff would receive one-third of the profit realized from the sale of "Oklahoma Weather" in the Channel 9

viewing area in consideration of plaintiff's promise to relinquish any further right or interest in the booklet. This agreement was valid and is now binding on the parties and requires that judgment be entered declaring that plaintiff is entitled to an accounting by defendants for one-third of the profits they have achieved from the sales of "Oklahoma Weather" in the Channel 9 viewing area.

The judgment below is therefore reversed and the cause remanded with directions to reinstate the judgment entered on the special verdict returned September 10, 1975 and to proceed with an accounting.

BACON and NEPTUNE, JJ., concur.