Glen H. Gordon, as Administrator of the Estates of Barbara Smith and Maude Smith, both Deceased, Plaintiff-Appellant, v. Farmer City Cheese Company et al., Defendants. Thomas W. Bishop, Jr., Artis G. Bradshaw, and Frank B. Osterbur, as Administrator of the Estate of Ralph B. Smith, Deceased, Defendants-Appellees.

Gen. No. 10,333.

Third District.

September 6, 1961.

Appleman, Zimmerly & McKnelly, and John H. Finfrock, of Urbana, for appellant.

Busch, Harrington & Porter, of Champaign, for appellees Thomas W. Bishop, Jr. and Artis G. Bradshaw; Reno & O'Byrne, of Champaign, for appellee Frank R. Osterbur, as Administrator of the Estate of Ralph B. Smith.

ROETH, PRESIDING JUSTICE.

This is a wrongful death action arising out of the collision of a passenger automobile with a milk truck. The passenger automobile was being driven by Ralph Smith. His wife, Theda Smith, and three children were passengers in the car. Ralph Smith and the daughter Barbara Smith, aged 3½ years, and the daughter Maude Smith, aged 5 months, lost their lives in the collision. The wife Theda and the son, a small child, sustained injuries but survived the collision. The milk truck was being driven by defendant Thomas W. Bishop, Jr., who was at the time, the employee of

defendant Artis G. Bradshaw. The suit in question was brought by the administrator of the estates of Barbara Smith and Maude Smith against the administrator of the estate of Ralph Smith, charging in separate counts, that as to each deceased the said Ralph Smith was guilty of wilful and wanton misconduct in the operation of the passenger automobile and against Bishop and Bradshaw, charging in separate counts that as to each deceased, Bishop as servant and Bradshaw as master were guilty of negligence in the operation of the milk truck. By separate verdicts the jury found the issues in favor of all defendants and judgments were entered on the verdicts. Post trial motions of the plaintiffs were overruled. This appeal followed.

■ The first and principal error assigned by counsel for plaintiffs is that the verdicts are contrary to the manifest weight of the evidence. In considering this assignment of error we are required to examine the evidence in some detail. In so doing we are cognizant of the well settled rule which guides us, namely: a court of review cannot hold the jury's verdict to be against the manifest weight of the evidence unless an opposite conclusion is clearly evident.

The collision in question occurred on August 23, 1958, at 11:00 a. m. The day was a good summer day, the weather was clear and the visibility good. It occurred on Route 150, a paved highway, in front of the driveway leading into the Kagel farm in the country. At the point of entrance into the Kagel farm, Route 150 extends in a northwest-southeast direction. Some 500 feet northwest of the entrance to the Kagel farm, Route 150 curves to the north. As an automobile proceeds on Route 150 in a southerly and southeasterly direction around the curve, the entrance to the Kagel farm is clearly visible at a point 800 feet northwest of the entrance and proceeding another 300 feet in a

88

southerly-southeasterly direction around the curve the highway straightens out at the 500 foot point. At the time of the occurrence the southbound lane of Route 150 was 9 feet wide and the northbound lane was 11 feet wide and the highway was in the process of being widened with grading on both sides but no permanent topping having as yet been added. The entrance to the Kagel farm is on the left as a car proceeds southeasterly, with the driveway extending at approximately a 70° angle to the northeast. In other words, the Kagel driveway does not enter Route 150 at a 90° angle. The angle is sharper going southeast and wider going northwest. These road conditions are undisputed.

On the morning of the occurrence Bishop left Farmer City at from 6:30 to 7:00 a. m. to pick up milk along Route 150 for Bradshaw. He was driving a milk truck. This consisted of a cab for the driver, to the rear of which was a truck frame extending out over dual rear wheels. On this frame there was mounted an enclosed box like body. This enclosed box like body was 13 feet long and extended 6 feet to the rear of the center of the dual rear wheels and 3 feet to the rear of the truck frame upon which it was mounted. The overall length of the truck and body was 22 feet and it was 7 feet 8 inches wide and 8 feet high. The cab of the truck was red and the box like body white with large red lettering on the sides. Prior to leaving Farmer City, Bishop cleaned the windshield, side glasses, side mirrors and directional lights. The truck was equipped with directional lights in the front with amber like lenses and directional lights in the rear with red lenses. Bishop tested the directional lights and brakes and found them to be in working order. There is no dispute as to these facts.

Bishop was called as a witness under Section 60 by plaintiff and later testified on his own behalf. There

is no material variance in his testimony given on both occasions. He testified that prior to 11:00 a. m. he had picked up about 3,000 pounds of milk which together with empty cans was in the box like body. He was travelling south and southeasterly on Route 150 intending to pick up milk at the Kagel farm. As he came around the curve he was travelling 45 m.p.h. and as he approached the Kagel driveway he reduced his speed. As he rounded the curve he turned on his left directional signal and the lights inside the cab indicated the light was on and operating. He testified he was in the right hand lane and as he approached the Kagel driveway he bore his truck to the right of the highway in order to negotiate the turn into the driveway. As he was in the process of turning he was proceeding at 5 to 10 m.p.h. and he looked in his rear view mirror and saw the car operated by Ralph Smith just barely rounding the curve, 800 feet away, and proceeding in the same direction he was travelling. Bishop testified he was proceeding into the Kagel driveway and as the cab of the truck was well off the highway the collision occurred. He testified his left cab window was down, that he did not hear any horn, that if a horn had been sounded he would have heard it, and that he did not hear any squeal of tires or brakes.

Photographs in evidence indicate that the truck was struck at a point to the rear of the rear dual wheels. The box like body was torn loose from the frame and turned upside down on the east shoulder. The rear end of the truck was pushed sideways and the truck came to stop with the rear end of the frame projecting onto the highway in front of the Kagel drive. The left front of the Smith automobile was demolished and the engine, etc., pushed back into the front seat. The automobile came to rest on the east shoulder to the southeast of the overturned box like body.

90

Two State Troopers and a Deputy Sheriff testified for plaintiffs. They went to the scene after the collision. They testified to distances to the curve, visibility coming around the curve and the location of the truck and milk body after the collision. They all inspected the highway and did not find any evidence of skid marks by either vehicle.

Theda Smith, wife of Ralph Smith, testified for plaintiffs. She testified she remembered coming around the curve and first saw the milk truck when the car in which she was riding was 600 feet from it. She testified that her best judgment was that the speed of her husband's car at that time was between 55 and 60 m.p.h. She says her husband eased to the left of the highway to pass and when 75 feet from the truck, the truck turned left in front of her husband's automobile. Thereupon her husband pulled sharply to the right. On cross examination she admitted having made a statement almost two months after the accident in which she said she did not know how fast her husband was driving the car, didn't remember coming out of the curve, and did not see the truck before the accident. She accounts for this discrepancy by saying that she suffered a partial amnesia and at the time of the trial the events of the occurrence were gradually coming back to her. In fairness to the witness it should be noted that the record reveals that she suffered severe head injuries and was rendered unconscious.

Counsel for plaintiffs contend that the verdicts finding each defendant not guilty are not consistent with any legitimate interpretation of the evidence. They argue that since the question of contributory negligence does not arise in this case, one or both of the defendants is or are liable and that a verdict exonerating both cannot stand. The jury in this case had two separate issues to decide, i. e., (1) was defendant

91

Bishop guilty of negligence and (2) was the deceased driver of the automobile guilty of wilful and wanton misconduct. By finding defendant Bishop not guilty the jury found that Bishop did nothing which a reasonably prudent person would not do nor failed to do that which a reasonably prudent person would do in the operation of his truck. Apart and distinct from this finding, the jury found that the conduct of the deceased driver was not a conscious disregard for the safety of his passengers or an intentional disregard of a known duty necessary for their safety. The jury might well have believed the deceased driver was negligent and that his negligence was the sole proximate cause of the occurrence, but this was not the issue before the jury. The verdicts as returned by the jury are consistent. Wise v. Wise, 22 Ill App2d 54, 159 NE2d 500. Basically what counsel for plaintiffs would have this court do, is to substitute its judgment for that of the jury and to hold that the conduct of Bishop was negligence and/or that the conduct of the deceased driver was wilful and wanton misconduct. This we cannot do under the record before us.

At the request of counsel for defendant Bishop the court gave Bishop's instructions #3 and #4 which were as follows:

> "#3. The court instructs the jury that the plaintiff is required by law to prove his case by a greater weight or preponderance of the evidence; and if the jury shall believe that the plaintiff has not so proven his case as to Counts I and III against Thomas Bishop, Jr., and Artis G. Bradshaw, or if the evidence is evenly balanced so that the jury are in doubt and unable to say on which side is the preponderance, or if the preponderance of the evidence is in favor of the defendants, Thomas W. Bishop, Jr., and Artis G. Bradshaw, then in either of these cases your

verdict should be for the defendants, Thomas W. Bishop, Jr., and Artis G. Bradshaw.

"#4. The Court instructs the jury that if you find from the evidence and under the instructions of the court that the plaintiff is not entitled to recover from the defendants Thomas W. Bishop, Jr., and Artis G. Bradshaw then you will have no occasion to consider the question of damages as against such defendants, or the nature or extent of the plaintiff's loss or damage, if any, as against such defendants."

■ At the request of counsel for the administrator of the deceased driver the court gave Osterbur's instructions #1 and #2 which were as follows:

"#1. The court instructs the jury that the plaintiff is required by law to prove by a greater weight or preponderance of the evidence that Ralph B. Smith, the intestate of Frank R. Osterbur, administrator, was guilty of willful and wanton misconduct which proximately caused the death (of) Maude Smith and Barbara Smith; and if the jury shall believe that the plaintiff has not so proven his case as to Counts II and IV against Frank R. Osterbur, administrator of the estate of Frank B. Smith, deceased, or if the evidence is evenly balanced so that the jury are in doubt and unable to say on which side is the preponderance, or if the preponderance of the evidence is in favor of the defendant, Frank R. Osterbur, administrator, then in either of these cases your verdict should be for the defendant, Frank R. Osterbur, administrator of the estate of Ralph B. Smith, deceased.

"#2. The court instructs the jury that if you find from the evidence and under the instructions of the court that the Plaintiff is not entitled to recover from the Defendant, Frank R. Osterbur,

as Administrator of the Estate of Ralph B. Smith, deceased, then you will have no occasion to consider the question of damages, as against such defendant, or the nature or extent of the Plaintiff's loss or damage, if any, as against such defendant."

Counsel for plaintiffs contend that Bishop's instruction #4 and Osterbur's instruction #2 should have been combined in a single instruction and Bishop's instruction #3 and Osterbur's instruction #1 should have been combined in a single instruction. They rely principally upon Triolo v. Frisella, 3 Ill App2d 200, 121 NE2d 49, in support of this contention. In the Triolo v. Frisella case four defendants were charged in one count, with negligence in felling a tree. Each was represented by separate counsel. A total of 96 instructions were tendered by counsel for the parties and 42 instructions were given to the jury. Many of the 37 instructions given on behalf of the defendants were duplicates except that they applied to different defendants. In addition 23 of the 37 instructions directed a verdict. The error in the method employed by counsel for each defendant in tendering duplicate instructions as to each defendant is predicated in part at least on the proposition that all defendants were acting in unison in producing a common result. The court observed that the negligence of one could not be set apart from the negligence of the others and that they were either all guilty or all not guilty. The court was careful to point out, however, that a different situation presents itself where there are different causes of action alleged by several plaintiffs or where different causes of action are alleged against different defendants. The Triolo case is therefore not in point and no error was committed by the trial court in this regard.

■ Counsel for plaintiffs also contend that the "evenly balanced" feature of Bishop's instruction #3 and Osterbur's instruction #1 is subject to criticism. We agree with this contention and so held in Hughes v. Medendorp, 294 Ill App 424, 13 NE2d 1015. However, no case is called to our attention holding that such an instruction in and of itself constitutes reversible error. In passing it is to be noted that the new Illinois Pattern Jury Instructions recommends that no such instruction be given in the future (see page 122).

■ The trial court at the request of the administrator of the deceased driver gave the following instructions:

"#3. The court instructs the jury that to make an act wanton, the party doing the act or failing to act must be conscious of his conduct, and though having no intent to injure, must be conscious, from his knowledge of the surrounding circumstances and existing conditions, that his conduct will naturally and probably result in injury to another.

"#4. The court instructs the jury that a willful act is one done with an intentional disregard for the safety of the person or property of another and with an entire absence of care for the safety of the persons or property of others, such as would show a conscious indifference to consequences."

It is contended that it was error to attempt to define the term "wilful" and the term "wanton" by separate instructions and that the definitions do not accurately define the terms. In Myers v. Krajefska, 8 Ill2d 322, 134 NE2d 277, it was held that the definition of wilful and wanton misconduct is basically, such conduct as indicates an actual intention to injure or such conduct as demonstrates a conscious disregard or indifference

95

for the consequences when the known safety of other persons is involved. This definition was approved in Hering v. Hilton, 12 Ill2d 559, 147 NE2d 311, and we followed it in Anderson v. Launer, 13 Ill App2d 530, 142 NE2d 838. The current Illinois Pattern Jury Instructions define wilful and wanton misconduct in accordance with the above cases. IPI 14.01. While the two instructions might well have been combined and some of the verbosity eliminated, we cannot see how the jury could have been misled, especially in the light of plaintiffs' instruction #10 which told the jury as follows:

> "If you find from the greater weight of the evidence that the decedent, Ralph B. Smith, saw, or by the exercise of ordinary care would have seen, if you so find that he did not so do, the presence of apparent danger, and that he did not thereafter exercise care to avoid such danger, then you may find that the said decedent was guilty of wilful and wanton misconduct at that said time and place."

Thus plaintiffs applied the definition specifically to their theory of the case and to the facts as they conceived them to be. In passing, we again note that courts of review have frequently stated that the function of instructions is to advise the jury of the pertinent law in language appropriate for its immediate application to the case, and the test is not what meaning counsel can at leisure attribute to them but how and in what sense, under the evidence before them and the circumstances of the trial, ordinary men acting as jurors will understand the instructions considered as a series (Reivitz v. Chicago Rapid Transit Co., 327 Ill 207, 213; 158 NE 380).

██ Counsel contend that the trial court committed error in the use of the Handbook for Jurors in Illinois Civil Cases. The record discloses that before the

jurors were sworn to answer questions on voir dire examination, the trial judge read the contents of the Handbook to the entire panel of jurors. No objection was made by any counsel to this action of the court. At the conclusion of the trial and when the jury was sent to the jury room to deliberate on their verdict, the court directed that copies of the Handbook be furnished to the jurors and sent with the jury to the jury room. At that time one of counsel for plaintiffs advised the court that he had not seen the Handbook prior to that time and objected to the action of the trial court in sending copies thereof to the jury room. Counsel for each defendant, apparently taking a cue from the remarks of counsel for plaintiffs, then objected on the grounds that the Handbook was not evidence in the case and did not come within the recognized category of instructions. These objections were overruled and the Handbooks were taken by the jury to the jury room.

The background leading to the preparation of a Handbook for Jurors in Illinois Civil Cases is important. In People v. Izzo, 14 Ill2d 203, 151 NE2d 329, a case arising in the Criminal Court of Cook County, when the jurors, who were selected for service, were assembled in the jury room one of the judges of the Criminal Court addressed them at some length outlining the duties and responsibilities generally during their period of service as jurors. In the Supreme Court error was assigned, first, as to the propriety of the practice generally, and second, as to certain remarks specifically. In holding that no reversible error was committed in either instance the Supreme Court said:

> "No litigant has a right, constitutional or otherwise, to have his case tried before ignorant jurors. To acquaint the juror with his duties and responsibilities in a new environment and to increase his

understanding of the processes of a trial can hardly be objectionable in itself. There is no way of knowing what misconceptions might exist in the absence of an official explanation. . . . The possibility of misinformation can be reduced if not eliminated by careful preparation; and in any case the value of generally sound orientation in getting rid of antecedent misconceptions is so great as to outweigh any minimal inaccuracies that would be likely to occur."

The Supreme Court then observed:

". . . we think it appropriate to add that we feel that whatever risks may be involved are lessened by the use of a carefully prepared pamphlet distributed to the jurors. That method, we think, is to be preferred to the extemporaneous statement used in this case."

Following the observation made by the Supreme Court in the above case, the Illinois Judicial Conference, established pursuant to Supreme Court Rule 56–1, embarked upon a comprehensive study of the matter. Handbooks for Jurors in use in some 14 other states and in the District Courts of the United States were examined and studied. Suggestions and data were obtained from the American Bar Association, Chicago Bar Association, American Judicature Society, Professors of Law Schools and the Attorney General of the State of Illinois. The final work product was presented to the 1959 Illinois Judicial Conference in June, 1959, and printed copies of the Handbook, as it appears in the record before us, were made available for use in all of the trial courts of Illinois in December, 1959. It was contemplated that the Handbook would be distributed to prospective jurors in advance of jury service. It was likewise contemplated that the jurors would retain the Handbook for

reference and as a guide during their period of jury service. Obviously, such a practice of distribution would recognize that the jurors might well have the Handbook available for personal reference at such time as they were deliberating in the jury room. Consequently great care was exercised in the preparation of the material contained in the Handbook, so as to obviate any objection that the same constituted instructions to the jury as to the law of a particular case, as the same are generally understood by the bench and bar of Illinois.

Counsel for plaintiffs in their brief now insist that the Handbook is unfortunately worded and that the verbiage is improper. Specifically they complain of the use of such words and phrases as "must", "it is your sworn duty" or that "it is your solemn oath" to do certain things. When the Handbook is examined in view of the specific objection made, it seems apparent to us that the objections are hyper-critical and without merit. We have carefully examined the language of the Handbook and find nothing therein which would have the least tendency to prejudice the rights of a litigant in a civil case. On the other hand the Handbook contains helpful information to jurors as to their duties and responsibilities so as to better orientate jurors as to what jury service entails, without reference to any specific lawsuit. In passing, we are of the opinion that the better practice in the use of the Handbook, would be to distribute the Handbook to each prospective juror at the time the jury is impanelled and to permit each juror to retain the same for reference during jury service. However, while not consonant with the better practice, we find no error in the practice followed in the case at bar.

Counsel for plaintiffs contend that the trial court erred in refusing admission of motion pictures taken of the deceased plaintiffs a short time before their deaths. These were offered to show the physical well

being of the deceased plaintiffs as bearing upon the question of damages. Likewise it is contended that the court erred in refusing to permit a university professor to testify concerning certain government charts, tables and records concerning earning capacities of persons and particularly female persons during the period of their work expectancies, as bearing upon the question of damages. Since, however, we have concluded that the verdicts of non-liability are not against the manifest weight of the evidence, and that there was no reversible error in the instructions, we do not deem it necessary to pass on these contentions.

Accordingly the judgments of the Circuit Court of Champaign County will be affirmed.

Affirmed.

REYNOLDS and CARROLL, JJ., concur.