Armida Cardona, a Minor, by Emeterio Cardona, Her Father and Next Friend, Plaintiff-Appellee, v. Clyde Marion Toczydlowski, Wolf Flour Cartage Co., Inc., a Corporation, and Willie Wiley, Defendants, Wolf Flour Cartage Co., Inc., a Corporation, Certain Defendant-Appellant.

Gen. No. 48,387.

First District, First Division.

March 5, 1962.

12

Arthur Abraham, George J. Gore, and Robert L. Brody, of Chicago, for appellant.

Samuel E. Bublick, of Chicago (Edward Wolfe, of counsel), for appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

This is a personal injury action, in which the jury returned a not guilty verdict as to defendant, Clyde Marion Toczydlowski, driver of the automobile with which plaintiff collided. A $40,000 verdict was rendered against the defendant Wolf Flour Cartage Company, Inc., owner of a delivery truck, which was double parked in the immediate area of the occurrence. Judgment was entered on this verdict. The trial court denied the alternate motions of defendant Wolf Flour for a judgment notwithstanding the verdict or a new trial, and it appeals.

On August 1, 1958, plaintiff, then about five years of age, lived with her parents in an apartment at the rear of 8810 Houston Avenue, Chicago. At about noon of that day, after leaving the gangway between 8808 and 8810 Houston, she ran into the street, from west to east, and into the right side of Toczydlowski's auto-

mobile. Plaintiff sustained serious injuries, which resulted in crossing and a permanent loss of vision of her left eye. There is no claim that the verdict is excessive. No questions are raised on the pleadings.

At the time of the occurrence, the truck of defendant Wolf Flour was parked in front of a bakery at 8802 Houston Avenue. The truck was a 2½ ton green panel truck, with a closed body, 12 to 13 feet long, 7½ to 8 feet wide, and about 10¾ feet high. It had doors on the back and on the right side. The truck was double parked, facing south, with its side door opened, about even with a sidewalk trapdoor of the bakery, and Wolf Flour employees were engaged in delivering sacks of flour to the bakery. The driver, Willie Wiley (dismissed as a defendant before trial), was in charge, and Walker Thurman was his helper. Wiley, who had been making weekly deliveries to the bakery since 1956, was in the truck getting sacks of flour ready to pass to Thurman, who was in the bakery basement. Neither saw the occurrence.

Wolf Flour does not dispute that its truck was double parked in violation of the Uniform Act Regulating Traffic on Highways (Ill Rev Stats 1957, c 95½, § 187(a)12), which prohibits parking a vehicle "on the roadway side of any vehicle parked at the edge or curb of a street." It claims that the position of its standing truck was not the proximate cause of the injury sustained by plaintiff, and that a jury could not reasonably find from the evidence that it was.

Wolf Flour contends that the violation of the parking statute is only actionable if it was the proximate cause of plaintiff's injuries. (Ney v. Yellow Cab Co. (1954), 2 Ill2d 74, 117 NE2d 74; Curran v. Chicago & W. I. R. Co. (1919), 289 Ill 111, 124 NE 330; Gray v. Pflanz (1950), 341 Ill App 527, 94 NE2d 693.) It ar-

gues that it was not and could not have been the violation of the parking statute that was a cause of plaintiff's injuries.

■ ■ We agree that if the negligence charged does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent independent act of a third person, the creation of the condition is not the proximate cause of the injury where the subsequent act is an intervening efficient cause, which breaks the causal connection between the original wrong and the injury, and itself becomes the proximate or immediate cause. The cause of an injury is that which actually produces it, while the occasion is that which provides an opportunity for the causal agencies to act. Merlo v. Public Service Co. of Northern Ill. (1943), 381 Ill 300, 316–318, 45 NE2d 665.

■ ■ However, "the intervention of independent concurrent or intervening forces will not break causal connection if the intervention of such forces was, itself, probable or foreseeable." (Johnston v. City of East Moline (1950), 405 Ill 460, 464, 91 NE2d 401.) "The test that should be applied in all cases in determining the question of proximate cause is whether the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first party's own negligence," (Merlo v. Public Service Co., 381 Ill 300, 317, 45 NE2d 665) ; and, if so, the connection is not broken. McLaughlin v. Alton R. R. (1935), 278 Ill App 551, 556.

■ Wolf Flour's principal contention, that the position of its double parked truck was not a proximate cause or actionable negligence, presents a question of law, which necessarily includes the determination of its claim that the trial court erred in denying its motion

15

for directed verdict and its motion for judgment notwithstanding the verdict for plaintiff; the same rule is used in passing upon both motions.

The question of law presented here is whether, when all the evidence is considered, together with all reasonble inferences therefrom, in its aspect most favorable to the plaintiff, there is a total failure or lack of evidence to prove proximate cause, a necessary element of plaintiff's case. (Finley v. New York Cent. R. Co. (1960), 19 Ill 428, 434, 167 NE2d 212.) The Appellate Court is precluded from weighing the evidence or determining where its preponderance lies. It should not consider the credibility of witnesses or undertake to reconcile any conflict in the evidence, and it must consider all evidence in the aspect most favorable to plaintiff, together with all inferences that may legitimately be drawn therefrom. (Lessen v. Allison (1960), 25 Ill App2d 395, 166 NE 2d 806.) Therefore, in our examination of the record on the question of proximate cause we have considered the evidence only in its aspects most favorable to plaintiff.

The evidence shows that defendant Toczydlowski, the driver of the automobile, was 18 years old and was familiar with the neighborhood. He knew there were many children in the area; "They gave Houston Avenue the nickname of 'Incubator Avenue.' " He was driving south on Houston and saw the double parked truck in front of the bakery, with its left side 3 feet to the right of the center line of Houston. He saw automobiles parked to the right "of this double parked truck." When he was about even with the north edge of 88th Street, he started going over to the northbound lane of Houston Avenue. He was half on the west side and half on the east side of the center line of Houston Avenue and looking at the northbound lane. He pro-

16

ceeded along the truck at 10 miles an hour, did not blow his horn, nor did he see a child at any time before the occurrence. When the front of his car was from 3 to 6 feet in front of the truck, he heard a "sudden thump" on the side of his car. He stopped his car in a distance of approximately 10 feet, facing in a southerly direction. Half of his automobile was still to the left side of the center line of Houston Avenue, and the rear was just about past the front of the truck.

An eyewitness, Mrs. Mary Warmus, was sitting on her front porch at 8810 Houston Avenue. She saw plaintiff standing on the west side of Houston Avenue close to 8808. "Armida was standing by the lamp post. Then she just ran across the street. . . . When Armida started to cross the street I didn't see any automobiles. I could not see past this truck which was parked out there. I didn't see which way the car was coming." On cross-examination she testified that plaintiff had to run between automobiles that were parked along the west curb; that defendant Toczydlowski was not "going real fast" and stopped within 10 to 15 feet, and that plaintiff bumped into the door of the car and was never in front of it. "After the accident this child was right in the middle of the street, directly off of the post I said was between the two pieces of property."

Another eyewitness, Reuben Paloma, was standing talking to Mrs. Warmus at 8810. He saw plaintiff when she was walking out of the gangway between 8810 and 8808. She dashed out into the street and "hit the column of the car where the door opens on a car. It took place between 8808 and 8810 by a light pole. It would be approximately two houses down the street from the bakery." Prior to seeing her dash out into the street, he saw a truck double parked to the

17

north, in front of the bakery. The person driving the car had come around the truck to get into his proper lane. The witness did not see the vehicle coming around the truck but did see it "when he was passing it up. This was after he passed the truck. After he passed the truck he turned to the west side of the street."

On cross-examination he testified that plaintiff was "at a slow run or trot" and did not stop when she got to the curb. She continued to trot until she hit the car. She was in between two parked cars when he saw the automobile coming, approximately 25 miles an hour. "He was already just about around the truck . . . coming into his own lane. . . . No part of his car was to the east of the center line. . . . He just rounded the truck and he would be in front of 8806. . . . It was one thing happened right after another. . . . The front of the child came in contact with the column of the car. . . . There were some cars there. They were not close together, about five or six feet apart. . . . This automobile came to a stop about eight or ten feet after the accident."

A police officer, who lived at 8806 Houston, was working "underneath the sidewalk" of 8806 and climbed up when he heard a scream. Plaintiff was lying in the street just about in front of the building at 8808 Houston, toward the middle of the building, probably 40 to 50 feet from the bakery, "a little over the width of a house." "The bakery is 8802 and I lived at 8806. . . . there is no 8804." "The house lots there run about 25 feet."

We believe reasonable men might differ as to whether the position of the parked truck was a proximate cause of plaintiff's injuries. If so, it was a jury question.

18

We think reasonable or fair-minded men could conclude: that the double parking prohibition was not only for the purpose of speeding up vehicular traffic, but was also intended as a traffic safety measure (Schiff v. Oak Park Cleaners & Dyers (1956), 9 Ill App2d 1, 9, 132 NE2d 416); that the double parked truck forced Toczydlowski over the center lane and from his proper path of travel, caused him to concentrate on getting around the truck and on northbound traffic; that all of this distracted his attention, made him less alert as to the obscured area directly and immediately south of the truck, and resulted in his not seeing plaintiff; that this was a natural and probable consequence of double parking, and therefore the position of the Wolf Flour truck was a proximate cause of plaintiff's injuries. It was not essential that the precise injury should have been foreseen or anticipated. Danhof v. Osborne (1956), 10 Ill App2d 529, 541, 135 NE2d 492.

It may be argued that the parked cars at the curb obstructed the view of plaintiff as to southbound traffic, while she was at the curb. However, there is testimony that the cars were not parked close together, that they were about 5 or 6 feet apart. We think it a legitimate inference that the truck, because of its size, opacity and position, obstructed and increased the immediate street area beyond which plaintiff could not see. We think it reasonable to infer that the position of the truck caused her to believe that the street was free from southbound cars and resulted in her dashing into the street while the Toczydlowski automobile, unseen by her, was approaching on the east side of the truck, so that she ran into the side of the automobile without her previously seeing it or the driver seeing her.

19

■ ■ We conclude that the determination of proximate cause in this case was a question for the jury. Questions which are composed of factors sufficient to cause reasonable men to arrive at different results should never be determined as matters of law. The debatable quality of issues such as negligence and proximate cause, the fact that fair-minded men might reach different conclusions, emphasize the appropriateness and necessity of leaving such questions to a fact-finding body. To withdraw such questions from the jury is to usurp its function. Ney v. Yellow Cab Co., 2 Ill2d 74, 84, 117 NE2d 74.

■ Defendant contends that it was error to refuse to give the following instruction: "A plaintiff cannot recover damages on account of neglect by the defendant of a duty required by a statute unless such neglect, if any, was a proximate cause of the injuries, if any, sustained by the plaintiff," and that the failure to give this instruction "may well have prevented a fair and just trial." We have examined the instructions and believe that the jury was adequately instructed on the question of proximate cause.

In plaintiff's instruction No. 3, the jury was instructed on the meaning of "proximate cause." In plaintiff's instruction No. 7, the jury was instructed as to the language of the statute pertaining to parking, and it included the test of whether the violation of the statute was a "proximate cause" of the injuries sustained by plaintiff. Defendant's contention comes within the rule that, "where a refused instruction contains the same principles contained in other instructions given and the instructions given correctly state the law, the case will not be reversed even though the refused instruction also correctly states the law." (Dept. of Public Works & Bldg. v. Lambert (1952), 411 Ill 183, 195, 103 NE2d 356.) We believe the instructions given in this case stated fairly, correctly and distinctly, the law applicable to defend-

20

ant's case and conveyed its theory of the case to the jury with substantial accuracy and without prejudice. (Pinkstaff v. Pennsylvania R. Co. (1960), 23 Ill App 2d 507–12, 163 NE2d 728.) The refusal of the tendered instruction was not error.

█ █ We find no error in the conduct of the trial or in the denial of defendant's motions for directed verdict or judgment notwithstanding the verdict. A reviewing court will not disturb a verdict where the evidence is conflicting, unless the verdict is clearly wrong or unless the court is satisfied that the verdict is against the manifest weight of the evidence, and that an opposite conclusion is clearly evident. (Bunton v. Illinois Cent. R. Co. (1957), 15 Ill App 2d 311, 322, 146 NE2d 205.) A verdict will not be set aside merely because the jury could have found differently or because judges feel that other conclusions would be more reasonable. Kahn v. James Burton Co. (1955), 5 Ill2d 614, 623, 126 NE2d 836.

The only substantial conflict of evidence in this case is the point of collision. Defendant Toczydlowski testified it was from 3 to 6 feet after the front of his car passed the front of the truck. The police officer says plaintiff was found in front of 8808, or about 40 to 50 feet from 8802. The two eyewitnesses indicate the point of impact to be opposite the gangway between 8808 and 8810. We fail to see that this conflict in testimony clearly indicates an opposite conclusion to the verdict of the jury, such as is required to set the verdict aside. Gordon v. Farmer City Cheese Co. (1961), 32 Ill App2d 85, 88, 177 NE2d 18.

For the reasons given, the judgment is hereby affirmed.

Affirmed.

BURMAN, J., concurs.

ENGLISH, J., dissents.

21

MR. JUSTICE ENGLISH, dissenting:

I believe the judgment should be reversed and the cause remanded for a new trial. The verdict was, in my opinion, contrary to the manifest weight of the evidence.

As is shown by the recital of facts in the majority opinion, the overwhelming weight of the evidence establishes the fact that plaintiff ran into the side of the automobile directly opposite a light pole between 8808 and 8810 South Houston Street. This point is fifty feet south of the south side of the bakery and, therefore, at least 50 feet south of the front end of the parked truck. Since the child hit the middle of the side of the moving car, it means that the front of the car had traversed something more than 55 feet after passing the front of the truck.

Plaintiff was not yet five years old, and too small to be seen by a motorist while she was behind the rows of cars which lined the street, and until she emerged, running, from between two of the parked cars. The witness Paloma, who, with Mrs. Warmus, was in an ideal position to see the occurrence, testified that plaintiff came out of a gangway between the two houses, crossed the sidewalk at a slow run, and, without stopping at the curb, continued out 8 to 10 feet into the street when she hit the side door column of the car. Thus, she had taken only a step or two from behind the parked car when the impact occurred. From this, the conclusion is inescapable that she was still obscured behind the parked car at just about the instant when the front of the moving automobile passed her. The driver of the car could not, and, as the evidence shows, did not see her. Under these circumstances, it seems to me to be of no consequence

22

whatsoever that the driver had driven around a double-parked truck some 50 feet back. The evidence of proximate causation is utterly lacking.

Nor is this lack of causation evidence limited to the circumstantial situation I have referred to above. Paloma's direct evidence was to the effect that plaintiff was in between two parked cars when he first saw the moving automobile, at which time it was already around the truck and coming into its own lane in front of 8806 Houston. At that time the moving car was, therefore, only about 25 feet away from the point of the accident, and plaintiff was obscured between two parked cars. That identical situation would have existed regardless of whether the truck had been parked where it was, or a mile away. At that critical point in time before this unfortunate occurrence, the truck was not obscuring the driver's view of plaintiff, and the truck was not obscuring plaintiff's view of the moving car. The parked car, however, was obscuring the view of both.

To assume, as the majority does, that the driver of the car was caused by the truck to concentrate on getting around the truck, was distracted, less alert, etc., and, as a consequence, failed to see plaintiff, is sheer speculation completely lacking in evidentiary support. The testimony of all the disinterested witnesses shows that plaintiff, in running out from behind a parked car, ran only two or three feet past the street side of the parked car when she struck the middle of the side of the driver's car; so he couldn't have seen her, however alert and undistracted he might have been.

The only conflict in the evidence arises from the driver's testimony to the effect that the occurrence

took place just as he was passing the front of the truck. Were it not for this testimony, I would conclude that defendant's motion for a judgment notwithstanding the verdict should have been allowed, and that a judgment of reversal should be entered in this court. This self-serving testimony of the driver, however, can be given no substantial weight as against the overwhelming evidence locating the point of accident far enough down the street effectively to remove the truck and its owner from any question of responsibility.*

Unless we are to abandon appellate review of motions for new trial on the question of manifest weight of the evidence, then we should award a new trial in this case, which I consider a classic example. The principle of considering the evidence in the light most favorable to plaintiff, as stated, with citations, by the majority, does not apply to our consideration of whether or not a new trial should be granted. In such circumstances, we should, of course, weigh the evidence, and, in doing so, I find it weighted heavily in favor of defendant. (Eilers v. Chicago Transit Authority, 2 Ill App2d 233, 236, 119 NE2d 449.)

---

* In addition to the witnesses whose testimony on this point was alluded to in the majority opinion, the truck driver also testified that the group of people gathered in the street after the accident, were two or three houses down the street from the truck.